United States District Court for the
Northern District of Illinois
(219 South Dearborn Street, Chicago, IL 60604)

Alex Garcia Enterprises,
  Inc. (AGE),
Plaintiff (Pro Se)

)
) C.A. No.
)
)

14cv3814
JUDGE LEINENWEBER
MAG. JUDGE BROWN

V.

Guggenheim Partners,
Pluribus Capital, the
Nielsen Corporation,
Billboard Magazine,
& The Hollywood Reporter,
Defendants

)
)
)
)
)
)
)

**RECEIVED**

MAY 2 2 2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# COMPLAINT

COMES NOW, the plaintiff Alex Garcia Enter-
prises, Inc. (hereinafter referred to as AGE) which is
bringing forth this complaint against all five defend-
ants seeking joint and several liability in which the
five defendants would presumably seek contribution and
indemnity from each other through the filing of cross-claims
and also consistent with the principles of contributory
negligence, pure or modified comparative negligence, and
apportionment of fault. In filing this complaint, the
plaintiff states, avers, and alleges the following:



# I.) NATURE OF THE CASE

1.) The plaintiff (AGE) is alleging that all five defendants have committed negligence.

2.) The plaintiff (AGE) is alleging that all five defendants have committed civil and/or common law fraud.

3.) The plaintiff (AGE) is alleging that all five defendants have committed conversion.

4.) The plaintiff (AGE) is alleging that all five defendants have committed a breach of the warranty of merchantability.

5.) The plaintiff (AGE) is alleging that all five defendants have committed a breach of the warranty of fitness for a particular purpose.

6.) The plaintiff (AGE) is alleging that all five defendants have committed the tortious interference with business relations/contracts.

7.) The plaintiff (AGE) is alleging that all five defendants have committed the intentional infliction of emotional distress (IIED).

8.) The plaintiff (AGE) is alleging that all five defendants have committed a material breach of contract though the formation of a procedurally and substantively unconscionable contract; this material breach of contract claim also involves elements of a contractual moral obligation in addition to the application of the doctrine of promissory estoppel.

9.) The plaintiff (AGE) is also alleging that all five defendants have violated federal copyright law statutes including but not limited to the "black-letter law" provisions of the Sunny Bono Copyright Term Extension Act (CTEA), Digital Millennium Copyright Act (DMCA), and the Online Copyright Infringement Liability Limitation Act (OCILLA).

## II.) PARTIES TO THIS LITIGATION

10.) The plaintiff is a start-up record label and public relations firm "doing business as" (d/b/a) Alex Garcia Enterprises, Inc. (hereinafter referred to as AGE). Its nerve center and/or principal place of business (ppb) is located at 976 Douglas Ave., 2nd Floor, Providence, RI 02908. Its telephone number is listed as (401) 272-0547. Its email address is einsteinrockstar@hotmail.com. The articles of incorporation for the plaintiff (AGE) were filed on August 4, 2013 at 2:43pm EST in the office of the



Secretary of State of Rhode Island, i.e. A. Ralph Mollis. Although the doctrine of ultra vires transactions has been abolished in most jurisdictions by the Revised Model Business Code Annotated (RMBCA), the incorporators of AGE will amend the articles of incorporation in the event that the board of directors decides that this company should enter into a different business sector with a distinct Standard Industrial Classification (SIC). Because there has been a colorable compliance with valid state incorporation statutes, there are no issues involving a de facto corporation or corporation by estoppel. Because there are no issues involving civil fraud, inadequate capitalization, and/or the "alter ego" doctrine, there is no application of "piercing the corporate veil." Prior to the filing of the articles of incorporation for the plaintiff (AGE), Ronald Emit had been acting in the capacity of a promoter trying to draft preincorporation contracts. These preincorporation contracts would be assumed, adopted, and/or ratified upon the filing of the articles of incorporation for AGE. As such, the plaintiff (AGE) argues that it has the constitutional standing, causation, and redressability to represent Ronald Emit in this cause of action. Furthermore, the plaintiff (AGE) argues that Ronald Emit has the actual, apparent, express, and implied authority to bind the plaintiff (AGE) to contracts pursuant to the laws of agency and partnership. The plaintiff (AGE) also argues that the statute of limitations should be tolled because of the fact that neither the plaintiff (AGE) nor Ronald Emit previously knew



that they could bring forth this action pro se and "in forma pauperis" (IFP). This belief is reasonable under the circumstances because of the fact that bringing lawsuits pro se and "in forma pauperis" (IFP) was not covered while the plaintiff attended Saint Thomas University School of Law in Miami Gardens, FL. Moreover, the topics of proceeding pro se and "in forma pauperis" were not tested on any of the four bar exams taken by the plaintiff in the states of Arizona, Maryland, and Florida.

11.) The first defendant is "doing business as" (d/b/a) Guggenheim Partners. Its nerve center and/or principal place of business (ppb) is located at 227 West Monroe Street, Chicago, IL 60606. Its telephone number is listed as (312) 827-0100. Its media contacts are allegedly with the company "doing business as" (d/b/a) Sitrick and Company. More specifically, the media contacts for Guggenheim Partners are Thomas S. Mulligan and Terry Fahn. Thomas S. Mulligan can be reached at (310) 367-8567 and he can be emailed at tmulligan@sitrick.com. Terry Fahn can be reached at (310) 788-2850 and Terry Fahn can be emailed at terry_fahn@sitrick.com. On its own website, Guggenheim Partners describes itself as "a privately held global financial services firm with more than $210 billion in assets under management." Its website continues to state that Guggenheim Partners provides "asset management, investment banking and capital markets services, insurance services, institutional finance



and investment advisory solutions to institutions, governments and agencies, corporations, investment advisors, family offices and individuals." Apparently, Guggenheim Partners is now the parent corporation to Billboard Magazine and The Hollywood Reporter as it purchased these firms from the Nielsen Corporation on or around 2009.

12.) The second defendant is "doing business as" (d/b/a) Pluribus Capital Management. Although its specific mailing address is unknown, its nerve center and/or principal place of business (ppb) is located in Australia. The key executives for Pluribus Capital Management appear to be James A. Finkelstein, Matthew Doull, and George J. Green. In addition to Guggenheim Partners (e.g. the first-listed defendant), Pluribus Capital Management appears to be the parent corporation of Billboard Magazine and The Hollywood Reporter as both Guggenheim Partners and Pluribus Capital Management purchased Billboard Magazine and The Hollywood Reporter from the Nielsen Corporation.

13.) The third defendant is "doing business as" (d/b/a) Nielsen Corporation. Its nerve center and/or principal place of business (ppb) is located at 85 Broad Street in New York, NY 10004. Its telephone number is listed as (800) 864-1224. The Nielsen Corporation had been the parent corporation of Billboard Magazine and The Hollywood Reporter until these two multi-million dollar magazine publications were sold



to Guggenheim Partners and Pluribus Capital Management on or around 2009. The chief executive officer (CEO) of the Nielsen Corporation is Mitch Barns; the chief financial officer (CFO) is Jamere Jackson; the chief human resources officer is Mary Liz Finn; the chief operating officer (COO) is Brian West.

14.) The fourth defendant is "doing business as" (d/b/a) Billboard Magazine. Its nerve center and/or principal place of business (ppb) is located at 5055 Wilshire Blvd., Los Angeles, CA 90036. Its telephone number is listed as (323) 525-2300. Janice Min is the head of Billboard Magazine and The Hollywood Reporter as her specific title is co-president of the entertainment group for Guggenheim. It is also important to note that Billboard Magazine is the parent corporation of Sonicbids, Inc. which has not been listed as a defendant in the present case at bar.

15.) The fifth and final defendant is "doing business as" (d/b/a) The Hollywood Reporter. Its nerve center and/or principal place of business (ppb) is located at 5700 Wilshire Blvd., Suite 500, Los Angeles, CA 90036. Its main telephone number is listed as (323) 525-2000. To reiterate, Janice Min is the head of Billboard Magazine and The Hollywood Reporter as her specific title is co-president of the entertainment group for Guggenheim. The Hollywood Reporter is no longer the subsidiary of the Nielsen Corporation as the



multi-million dollar magazine publication had been sold to
Guggenheim Partners and Pluribus Capital Management on or
around 2009.

## III.) JURISDICTION AND VENUE

16.) According to Rule 8(a)(1) of the Federal Rules of Civil
Procedure (F.R.C.P.), the plaintiff is required to provide "a
short and plain statement of the grounds for the court's
jurisdiction, unless the court already has jurisdiction and
the claim needs no new jurisdictional support."

17.) Because the court does not already have personal or subj-
ect matter jurisdiction over this issue, it is necessary to en-
gage in a brief discussion about the court's jurisdiction so
that the defendants can not move to dismiss this case based
on procedural grounds involving a lack of proper jurisdiction.

18.) Pursuant to 28 U.S.C. §1332, the U.S. District
for the Northern District of Illinois (in Chicago, IL) has
jurisdiction over this matter because there is complete diver-
sity of jurisdiction between the plaintiff and the five corpor-
ate defendants.

19.) As an Article III court, the U.S. District Court for the
Northern District of Illinois (in Chicago, IL) has subject
matter jurisdiction over this issue because this proceeding



involves a discussion of the potential violation of federal statutes including but not limited to the Sonny Bono Copyright Term Extension Act (CTEA), Digital Millennium Copyright Act (DMCA), Audio Home Recording Act (AHRA), and the Online Copyright Infringement Liability Limitation Act (OCILLA).

20.) Venue in this jurisdiction is also proper pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1400.

21.) Because the amount in controversy exceeds $75,000 (i.e. $450,000,000 is greater than $75,000), this court also has jurisdiction with regards to that particular issue.

## IV.) STATEMENT OF FACTS

22.) On or around the summer of 2007, Ronald Emit had been contacted by Charles Perez of Billboard Magazine and David Moser of The Hollywood Reporter.

23.) Both Charles Perez and David Moser had informed Ronald Emit that he had won a Billboard R&B/hip hop contest through the online platform known as Sonicbids.

24.) As a result of winning this contest (through Sonicbids), Ronald Emit had been offered the opportunity to perform at a Billboard R&B/hip hop conference in Atlanta, GA.

25.) More specifically, Ronald Emit had been offered the opportunity to perform in a five-to-ten minute slot of time during a cocktail party at the Billboard R&B/hip hop conference featuring independent music or "indie music."

26.) However, Ronald Emit had been told that he needed to tender $5,000 to Billboard Magazine in order to be able to perform during this brief time period at the cocktail party featuring independent music at the 2007 R&B/hip hop conference in Atlanta, GA.

27.) Although Ronald Emit is not completely sure, he believes in "good faith" that he won this Billboard R&B/hip hop contest after submitting his reggaeton song "All the Fine Ladies" as part of his "electronic press kit" (EPK) submitted through Sonicbids, Inc., i.e. a subsidiary of Billboard Magazine.

28.) Ronald Emit argues that his memory can be refreshed if the defendants are compelled to produce the original contract as an exception to the hearsay rule as a "past recollection recorded."

29.) Pursuant to Rule 1002 of the Federal Rules of Evidence (F.R.E.), "An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." This is widely



referred to as the Best Evidence Rule or Original Document Rule.

30.) Pursuant to Rule 901 of the Federal Rules of Evidence (F.R.E.), "(a) In General. To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."

31.) The plaintiff (AGE) argues that the defendants should be required to authenticate and produce the original contract with Ronald Emit pursuant to the Best Evidence Rule/Original Document Rule and Rule 901 of the Federal Rules of Evidence (F.R.E.).

32.) The plaintiff (AGE) argues that the contract between Ronald Emit and Billboard Magazine could be entered into evidence as non-hearsay in the form of "legally operative language."

33.) Pursuant to the stare decisis/persuasive precedent of Palmer v. Hoffman, 318 U.S. 109 (1943) and Johnson v. Lutz, 253 N.Y. 124, 170 N.E. 517 (1930), the contract between Ronald Emit and Billboard Magazine could also be entered into evidence as a "business records" exception to the hearsay rule. As an alternative, the contract between Ronald Emit and Billboard Magazine could be

entered under the res gestae "catch-all" exception.

34.) Pursuant to Rule 401 of the Federal Rules of Evidence (F.R.E.), "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

35.) Pursuant to Rule 403 of the Federal Rules of Evidence (F.R.E.), "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

36. Pursuant to Rule 402 of the Federal Rules of Evidence (F.R.E.), "Relevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court.

37.) Pursuant to Rule 201(a), "This rule governs judicial notice of an adjudicative fact only, not a legislative fact."

38.) Pursuant to Rule 201(b) of the Federal Rules of Evidence (F.R.E.), "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally

Known within the trial court's territorial jurisdiction; or
(2) can be accurately and readily determined from sources
whose accuracy cannot reasonably be questioned. "

39.) Pursuant to Rule 201(c) of the Federal Rules of Evidence
(F.R.E.), "The court: (1) may take judicial notice on its own; or
(2) must take judicial notice if a party requests it and the
court is supplied with the necessary information."

40.) Pursuant to Rule 201(d) of the Federal Rules of Evidence
(F.R.E.), "The court may take judicial notice at any stage of
the proceeding."

41.) Pursuant to Rule 201(e) of the Federal Rules of Evidence
(F.R.E.), "On timely request, a party is entitled to be heard
on the propriety of taking judicial notice and the nature of
the fact to be noticed. If the court takes judicial notice be-
fore notifying a party, the party, on request, is still entitled
to be heard."

42.) Pursuant to Rule 201(f) of the Federal Rules of Evidence
(F.R.E.), "In a civil case, the court must instruct the jury to
accept the noticed fact as conclusive. In a criminal case,
the court must instruct the jury that it may or may not accept
the noticed fact as conclusive."

43.) In the present case at bar, the contract between Ronald

Emrit and Billboard Magazine is both logically and conditionally relevant and should not be excluded for public policy reasons such as subsequent remedial measures, proof of liability insurance, settlement negotiations, and/or plea bargain negotiations.

44.) The court should also take judicial notice that it is not the custom and usage of the music industry nor is it industrial routine for legitimate companies situated in the music business (such as Billboard Magazine and The Hollywood Reporter) to charge an independent artist $5,000 merely to perform at a five-to-ten minute slot during a cocktail party at an R&B/hip hop conference in Atlanta, GA.

45.) Nevertheless, Ronald Emrit tendered $2,000 to Billboard Magazine by advancing this amount as earnest money to Charles Perez.

46.) Ronald Emrit had to borrow this money from his mother so this involves the concept of other people's money (OPM).

47.) By tendering $2,000 to the office of Charles Perez, Ronald Emrit entered into a bilateral contract with Billboard Magazine accompanied by fully-binding offer, acceptance, and consideration.

48.) According to the Restatement (Second) of Contracts, an offer is defined as a "commitment to an identifiable offeree with certainty and definiteness of terms."

49.) Acceptance has to be in strict accordance with the common law Mailbox Rule and "Mirror Image" unless the contract involves the sale of tangible goods between two merchants situated in the specific business pertaining to the goods being sold.

50.) With regards to the sale of tangible or fungible goods between two merchants, acceptance can be according to the Uniform Commercial Code (U.C.C.) Rule 2-207, i.e. the "Battle of the Forms."

51.) According to the "Battle of the Forms," an acceptance is effectuated even if the acceptance adds an additional term so long as the additional term(s) does not materially alter the contract.

52.) According to the Restatement (Second) of Contracts, consideration is defined as being comprised of a "legal detriment" and "bargained-for-exchange."

53.) Pursuant to the Peppercorn Theory of Consideration, the courts do not really address the adequacy of consideration or the sufficiency of the "legal detriment" and

"bargained-for-exchange."

54.) The contract between Ronald Emit and Billboard Magazine had been memorialized into a written contract in strict accordance with the common law Statute of Frauds and/or U.C.C. 2-201 (notwithstanding the fact that the contract between Ronald Emit and Billboard Magazine did not involve the sale of fungible or tangible goods).

55.) Pursuant to the parol evidence rule, there were no prior or contemporaneous oral agreements which would have to have been integrated into the final, written contract between Ronald Emit and Billboard Magazine.

56.) Because of the fact that Ronald Emit tendered $2,000 to the office of Charles Perez (representing Billboard Magazine), the plaintiff (AGE) argues that an installment contract had been created (because of the fact that Ronald Emit still owed $3,000 to Billboard Magazine).

57.) The plaintiff (AGE) argues that this installment contract was both procedurally and substantively unconscionable because of the fact that the contract lacked "arm's length negotiations" and the bargaining power was in favor of Billboard Magazine and the other four defendants.

58.) Ronald Emit had been advised by Michael Ash-



burne, Esg. (of Oakland, CA) and Diane Leigh Davison, Esg. (of Baltimore, MD) that he should not enter into this contract with Billboard Magazine specifically because any company could obtain a license to use the Billboard Magazine logo/trademark to promote a conference.

59.) After being advised by Michael Ashburne, Esq. and Diane Leigh Davison, Esq. to avoid getting involved with this Billboard R&B/hip hop conference, Ronald Emit asked Charles Perez to give him a full refund of the $2,000 that he tendered as earnest money.

60.) After Ronald Emit asked him for a full refund, Charles Perez promptly refunded the $2,000 to Ronald Emit and his mother.

61.) The plaintiff (AGE) argues that Ronald Emit did not commit a material breach of contract by anticipatory repudiation when he notified Charles Perez ahead of time that he would not be participating in the 2007 Billboard R&B/hip hop conference in Atlanta, GA.

62.) To the contrary, Ronald Emit's request for a full refund should be characterized as a unilateral rescission which acts as a complete discharge of the express and construct ive conditions pertaining to the written, memorialized contract between Ronald Emit and Billboard Magazine.

63.) A rescission, whether unilateral or mutual, operates as a discharge of express and constructive conditions similar to a novation, modification (supported by additional consideration), accord and satisfaction, frustration of purpose, impossibility of performance (involving a force majeure and/or an "act of God"), impracticability, etc.

## V.) COUNT ONE: NEGLIGENCE

64.) In order to establish a prima facie case for negligence, the following elements must be proved:

(i.) A duty on the part of defendant to conform to a specific standard of conduct for protection of plaintiff against an unreasonable risk of injury;

(ii) A breach of that duty by defendant;

(iii) The breach is the actual and proximate cause of plaintiff's injury; and

(iv) Damage

65.) The plaintiff (AGE) argues that all five defendants committed negligence by breaching their duty owed to Ronald Emit, in terms of failing to offer him a fair contract in which he did not have to pay $5,000 to perform.

# VI.) COUNT TWO: CONVERSION

66.) In order to establish a prima facie case for conversion, the following elements must be proved:

(i) An act by defendant that interferes with plaintiff's right of possession in a chattel;

(ii) The interference is so serious that it warrants requiring defendant to pay the chattel's full value;

(iii) Intent; and

(iv) Causation.

67.) Acts of conversion include wrongful acquisition (theft), wrongful transfer, wrongful detention, and substantially changing, severely damaging, or misusing a chattel.

68.) The longer the withholding period and the more extensive the use, the more likely it is to be conversion. A less serious interference is trespass to chattels.

69.) Only tangible personal property and intangibles that have been reduced to physical form (e.g. a promissory note) are subject to conversion.

70.) Anyone with possession or the immediate right to possession of the chattel may maintain an action for conversion.

71.) The plaintiff may recover damages (fair market value at the time of conversion) or possession (replevin).

72.) In the present case at bar, the plaintiff (AGE) argues that all five defendants committed conversion at the point in time when Charles Perez accepted $2,000 from Ronald Emrit as earnest money tendered towards a $5,000 installment contract which was procedurally and substantively unconscionable.

73.) Because of the fact that a $2,000 check is considered to be a negotiable instrument/commercial paper (i.e. "three-party paper"), this $2,000 check would be considered a fungible or tangible good for the purposes of a "conversion" cause of action.

## VII.) COUNT THREE: CIVIL FRAUD

74.) In order to establish a prima facie case for intentional misrepresentation, fraud, deceit, the following elements must be proved:

(i) Misrepresentation of a material fact (no duty to

disclose and opinion not actionable unless rendered by someone with superior skill in the area). Silence is generally not enough; one must make affirmative mis-representations;

(ii) Scienter, i.e. when defendant made the statement, he or she knew or believed it was false or that there was no basis for the statement;

(iii) Intent to induce plaintiff to act or refrain from acting in reliance upon the misrepresentation;

(iv) Causation (actual reliance);

(v) Justifiable reliance (generally, reliance is justifiable only as to a statement of fact, not opinion); and

(vi) Damages (plaintiff must suffer actual pecuniary loss).

75.) In order to establish a prima facie case for negligent misrepresentation, the following elements must be proved:

(i) Misrepresentation by defendant in a business or professional capacity;

(ii) Breach of duty toward a particular plaintiff;

(iii) Causation;

(iv) Justifiable reliance; and

(v) Damages

76.) Generally, an action for negligent misrepresentation is confined to misrepresentations made in a commercial setting, and liability will attach only if reliance by the particular plaintiff could be contemplated.

77.) The plaintiff (AGE) argues that all five defendants committed civil fraud and/or common law fraud by attempting to charge $5,000 to Ronald Emit to perform at a Billboard R&B/hip hop conference (in Atlanta, GA) specifically when it is not the custom and usage/industrial routine of the music business for a reliable company (such as Billboard Magazine) to charge independent artists or "indie artists" for a showcase or performance.

78.) The plaintiff (AGE) argues that the attempt by Billboard Magazine to charge Ronald Emit $5,000 for the opportunity to perform is a disguised "payola transaction" expressly forbidden by 47 U.S.C. § 317.

VIII ) COUNT FOUR: BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

79.) When a merchant who deals in a certain kind of goods sells such goods, there is an implied warranty that they are merchantable [U.C.C. § 2-314].

80.) "Merchantable" means that the goods are of a quality equal to that generally acceptable among those who deal in similar goods and are generally fit for the ordinary purposes for which such goods are used.

81.) An implied warranty of merchantability applies to the present case at bar in the sense that Billboard Magazine and its subsidiary Sonicbids, Inc. offered an online service which is and was defective specifically because the online service required Ronald Emit to tender $5,000 to Billboard Magazine after he submitted his "electronic press kit" (EPK) featuring the song "All the Fine Ladies" written and recorded by Ronald Emit "professionally known as" (p/k/a) Satish Dat Beast.

82.) The plaintiff (AGE) is requesting that the court engage in a "legal fiction" that all five defendants committed a breach of the warranty of merchantability notwithstanding the fact that online services often do not involve the sale of tangible or fungible goods.

83.) This assertion is not argued down a "slippery slope" when one considers the fact that the online services provided

by Billboard Magazine and Sonicbids, Inc. are tangentially-related to the sale of Ronald Emit's commercially-released debut album "Unleash the Beast" (manufactured by Disc Makers of Pennsauken, NJ and its subsidiary CD Baby of Portland, OR).

## IX.) COUNT FIVE: BREACH OF THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

84.) An implied warranty of fitness for a particular purpose arises when the seller knows or has reason to know:

(i) The particular purpose for which the goods are required; and

(ii) That the buyer is relying on the seller's skill or judgment to select or furnish suitable goods.

85.) Usually, the seller will be a merchant of the type of goods in question; but this is not essential.

86.) The plaintiff (AGE) argues that the five defendants committed a breach of the implied warranty of fitness for a particular purpose by operating a defective website that attempted to charge Ronald Emit $5,000 in connection with his winning a Billboard R&B/hip hop contest through Sonic-

bids, Inc.

87.) Disclaimers of liability for breach of implied warranty must be specific and are narrowly construed [UCC §2-316].

88.) Contractual limitations on personal injury damages resulting from a breach of warranty for consumer goods are prima facie unconscionable [UCC §2-719].

89.) U.C.C. Section 2-715, indicates that when the plaintiff assumes the risk by using a product while knowing of the breach of warranty, any resulting injuries are not proximately caused by the breach.

90.) U.C.C. Section 2-607 requires the buyer to give the seller notice within a reasonable time after the buyer discovers or should have discovered the breach. Most courts have held that the requirement applies even in personal injury cases and where there is no privity between the parties.

91.) An express warranty arises where a seller or supplier makes any affirmation of fact or promise to the buyer relating to the goods that become part of the "basis of the bargain" [U.C.C. §2-313].

92.) U.C.C. Section 2-316 provides that a disclaimer will be effective only to the extent that it can be read

consistently with any express warranties made. This has the effect of making it practically impossible to disclaim an express warranty.

## X.) COUNT SIX: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS/ CONTRACTS

93.) In order to establish a prima facie case for interference with contract or prospective economic advantage, the following elements must be proved:

(i) Existence of a valid contractual relationship between plaintiff and a third party or a valid business expectancy of plaintiff;

(ii) Defendant's Knowledge of the relationship or expectancy;

(iii) Intentional interference by defendant that induces a breach or termination of the relationship or expectancy; and

(iv) Damage to the plaintiff

94.) The plaintiff (AGE) argues that all five defendants committed the tortious interference with business relations/

contracts by attempting to charge $5,000 to Ronald Emit which had the ultimate effect of preventing Ronald Emit from securing a commercial recording contract from any one of the following four major record labels or their subsidiaries: Universal Music Group, Inc. (UMG), Warner Music Group, Inc. (WMG), Sony BMG, or EMI, Inc..

95.) All five defendants have effectively prevented Ronald Emit from securing a commercial recording contract specifically because Ronald Emit could not afford to pay the $5,000 to Billboard Magazine notwithstanding the fact that Ronald Emit tendered $2,000 as earnest money to the office of Charles Perez.

96.) More specifically, Ronald Emit had been trying to secure a "360 deal" with a major record label and/or publishing company; this proposed "360 deal" would have a cross-collateralization clause and controlled composition clause.

## XI) COUNT SEVEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

97.) To establish a prima facie case for intentional infliction of emotional distress (IIED), the following elements must be proved:

i.) An act by defendant amounting to extreme and outrageous conduct;

ii.) Intent on part of the defendant to cause plaintiff to suffer severe emotional distress, or recklessness as to the effect of defendant's conduct;

iii.) Causation; and

iv.) Damages - severe emotional distress.

98.) The plaintiff (AGE) argues that the five defendants committed the intentional infliction of emotional distress (IIED) because it was egregious, extreme, and outrageous for Billboard Magazine to attempt to charge $5,000 to Ronald Emit after he allegedly won a Billboard R&B/hip hop conference through the Soniebids online platform.

99.) Needless to say, it is not the custom and usage of the music business (or industrial routine) for a legitimate company (such as Billboard Magazine) to charge anything or any amount of money for independent artists to perform at a cocktail party.

## XII.) COUNT EIGHT: MATERIAL BREACH OF CONTRACT

100.) A breach of contract occurs if it is found that (i) the promisor is under an absolute duty to perform, and (ii) this absolute duty of performance has not been discharged.

101.) If the obligee does not receive the substantial benefit of his or her bargain as a result of failure to perform or defective performance, the breach is considered material. If the breach is material, the consequences are more severe.

102.) The nonbreaching party (i) may treat the contract as at an end, i.e., any duty of counterperformance owed by her will be discharged, and (ii) will have an immediate right to all remedies for breach of the entire contract, including total damages.

103.) If a minor breach is coupled with an anticipatory repudiation, the nonbreaching party may treat it as a material breach; i.e., he or she may sue immediately for total damages and is permanently discharged from any duty of further performance. Indeed, the courts hold that the aggrieved party must not continue on, because to do so would be a failure to mitigate damages. The U.C.C. modifies this to permit a party to complete the manufacture of goods to avoid having to sell unfinished goods at the lower salvage value.

104.) In determining whether a breach is material or minor,

the courts generally apply the following six criteria (according to Restatement (Second) of Contracts § 275):

(i.) Amount of Benefit Received

(ii.) Adequacy of Damages

(iii.) Extent of Part Performance

(iv.) Hardship to Breaching Party

(v.) Negligent or Willful Behavior

(vi.) Likelihood of Full Performance

105.) The plaintiff (AGE) argues that the five defendants committed a material breach of contract at the point when Charles Perez tried to collect $5,000 from Ronald Emit specifically because it is not the custom and usage of the music industry (or industrial routine) for legitimate companies (such as Billboard Magazine) to charge independent artists with a fee for allowing them to perform at a cocktail party featuring independent music at an R&B/hip hop conference.

106.) Once again, the plaintiff (AGE) claims that all five defendants entered into a procedurally and substantively unconscionable contract with Ronald Emit by attempting

to charge him $5,000 for allowing him to perform at the party (cocktail) featuring independent music at the 2007 Billboard R&B/hip hop conference in Atlanta, GA.

107.) As a logical extension, there were no "arm's length negotiations" and the bargaining power was in favor of Billboard Magazine and the other four defendants.

## XIII.) COUNT NINE: VIOLATION OF THE SONNY BONO COPYRIGHT TERM EXTENSION ACT (CTEA)

108.) Sonicbids, Inc. failed to compensate Ronald Emit for the licensing of several of his songs for internet radio airplay, streaming or podcasts, and as tethered and untethered downloads. Sonicbids, Inc. is a subsidiary of Billboard Magazine and Billboard Magazine is now a subsidiary of Guggenheim Partners and Pluribus Capital Management. At the time that Ronald Emit had submitted his music through Sonicbids, both Billboard Magazine and The Hollywood Reporter were subsidiaries of the Nielsen Corporation; i.e. one of the defendants listed in the present case at bar. Because Ronald Emit has never received any performance or mechanical royalties from ASCAP, the plaintiff (AGE) argues that all five defendants have violated the Sonny Bono Copyright Term Extension Act (CTEA).

## XIV.) COUNT TEN: VIOLATION OF THE DIGITAL MILLENNIUM COPYRIGHT ACT (DMCA)

109.) Because Ronald Emit has never received any performance or mechanical royalties from ASCAP, the plaintiff (AGE) argues that all five defendants have committed a violation of the Digital Millennium Copyright Act (DMCA).

## XV.) COUNT ELEVEN: VIOLATION OF THE AUDIO HOME RECORDING ACT (AHRA)

110.) Because Ronald Emit has never received any performance or mechanical royalties from ASCAP, the plaintiff (AGE) asserts that all five defendants have committed a violation of the Audio Home Recording Act (AHRA).

## XVI.) COUNT TWELVE: VIOLATION OF THE ONLINE COPYRIGHT INFRINGEMENT LIABILITY LIMITATION ACT (OCILLA)

111.) Because Ronald Emit has never received any performance or mechanical royalties from ASCAP, the plaintiff (AGE) argues that all five defendants have committed a violation of the Online Copyright Infringement Liability Limitation Act (OCILLA).

# XVII.) PRAYER FOR RELIEF

WHEREFORE, the plaintiff (AGE) is seeking damages in the amount of $450,000,000 (four hundred-and-fifty million dollars) against all five corporate defendants assessing joint and several liability (whereby they would presumably seek contribution and indemnity from each other perhaps through the filing of cross-claims in this same transaction or occurrence (t/o) with a common nucleus of operative fact). This judgment amount of $450,000 would be considered a remedy at law for the defendants' commission of the following tortious and contractual acts: negligence, conversion, common law/civil fraud, breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, tortious interference with business relations/contracts, intentional infliction of emotional distress (IIED), material breach of contract, violation of the Sonny Bono Copyright Term Extension Act (CTEA), violation of the Digital Millennium Copyright Act (DMCA), violation of the Audio Home Recording Act (AHRA), and violation of the Online Copyright Infringement Liability Limitation Act (OCILLA). In bringing forth this "prayer for relief," the plaintiff (AGE) states, avers, and alleges the following:

A.) This judgment amount of $450,000,000 (four hundred and fifty million dollars) would be considered punitive, compen-

satory, actual, presumed, special, and treble damages asso-
ciated with the defendant's commission of the aforementioned
tortious acts.

B.) This judgment amount of $450,000,000 (four hundred
and fifty million dollars) would also be considered as expecta-
tion, reliance, restitution, incidental, and consequential damages
associated with the defendants having committed a material
breach of contract.

C.) Liquidated damages may also be applicable since a contract
was officially involved notwithstanding the fact that punit-
ive damages are not allowed according to the common law of cont-
racts. However, liquidated damages are distinct from the un-
enforceable penalty provisions imposed by punitive damages.

D.) A discussion of quantum meruit and unjust enrichment
also may be applicable; this contract is not caveat emptor
or "buyer beware."

E.) The plaintiff (AGE) is also seeking the equitable remedy
of specific performance and/or an injunction mandating all
five of the defendants to allow Ronald Emit to perform at
all Billboard R&B/hiphop conferences nationwide and to
have Ronald Emit's music (on future and past albums) pla-
ced on the Billboard charts and also to have his music eligi-
ble for consideration to win Billboard awards.

Respectfully submitted,

Ronald Satish Emmt

Alex Garcia Enterprises, Inc.
Attn: Ronald Satish Emmt
President and CEO
976 Douglas Ave., 2nd Floor
Providence, RI 02908
(401) 272-0547
einsteinrockstar@hotmail.com